## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **CAROLINE SMITH-FLATOW** | ) | |
| | ) | |
| **Plaintiff,** | ) | 07 C 7013 |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Der-Yeghiayan** |
| **CITY OF CHICAGO, et al.,** | ) | |
| | ) | **Magistrate Judge Denlow** |
| **Defendants.** | ) | |
| | ) | |

### DEFENDANTS' JOINT  MOTION TO DISMISS APPENDIX OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Plaintiff's First Amended Complaint |
| B | *Carvajal v. Dominguez*, No. 07-2598, --- F.3d ----, 2008 WL 4095483 (7th. Cir. Sept. 5, 2008). |

**<u>DEFENDANTS' EXHIBIT A</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CAROLINE SMITH-FLATOW ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | No. 1:08-CV-00647 |
| ) | |
| CHICAGO POLICE OFFICERS ) | Honorable Judge Aspen |
| S. REYES (Star #17832), ) | |
| L. WISE (Star #15647), ) | Magistrate Judge Nolan |
| and the CITY OF CHICAGO, ) | |
| Defendants. ) | |

**FIRST AMENDED COMPLAINT**

**NOW COMES** the plaintiff, Caroline Smith-Flatow, by and through their

attorneys, ERICKSON & OPPENHEIMER, LLC, complaining of the Defendants,

Chicago Police Officers S. Reyes (Star #17832), L. Wise (Star #15647) and the CITY OF

CHICAGO, and states as follows:

<u>**Introduction**</u>

1. This is a civil action seeking damages against Defendants for committing acts under

   color of law, and depriving Plaintiff of rights secured by the Constitution and laws of

   the United States.  In sum, Defendants denied Plaintiff equal protection under the law

   because of her gender, intentionally inflicted emotional distress, assaulted, unlawfully

   seized, falsely arrested and imprisoned her.   Plaintiff has been harmed by the

   unconstitutional conduct of the Defendants.

1

### Jurisdiction

2.  The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C., § 1983, the Judicial Code, 28 U.S.C. § 1331 and 1343 (a); the Constitution of the United States; and pendent jurisdiction for attendant state claims as provided under U.S.C., § 1367(a).

### The Parties

3.  Plaintiff Caroline Smith-Flatow resides at 57 W. 15th Street, Chicago, Illinois, 60605.

4.  Defendant Officers were, at the time of this occurrence, employees of the Chicago Police Department and acted under their authority as duly appointed police officers in the Chicago Police Department at all relevant times.

5.  Defendant City of Chicago is a municipal corporation organized under the laws of the State of Illinois, which operates the Chicago Police Department. Defendant City of Chicago is ultimately responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby.

### Background Facts

6.  On February 5, 2007, Plaintiff Smith-Flatow attended a Super-Bowl party at 1643 N. Burling (Burling & North Avenue), Chicago with her 3 children, Kristin (12), Billy (10) and Michael (8), her sister Sandra Smith and family friends.

7.  While at the Super-Bowl party, Plaintiff Smith-Flatow had three glasses of wine.

8.  At approximately 9:00 p.m., Plaintiff Smith-Flatow and Justin Palm, a family friend, took Smith-Flatow's children home for the evening.

2

9. Because the temperature on February 9, 2007, was approximately 2° Fahrenheit and because Mr. Palm's car was parked much closer to the party, Mr. Palm drove Smith-Flatow and her children to her home at 57 W. 15th Street, Chicago.

10. While at home, Plaintiff Smith-Flatow fed her children and got them ready for bed.

11. Smith-Flatow and Mr. Palm had tea with cheese and crackers while they waited an hour to an hour and a half for 8 year-old Michael and 10 year-old Billy to fall asleep. Kristin was left to baby-sit and was watching television in the bedroom when Smith-Flatow left.

12. At approximately 10:30 p.m., Plaintiff Smith-Flatow and Mr. Palm returned to the neighborhood where she had parked her car. On the way, they stopped at Mr. Palm's house who lives in the neighborhood. They stayed at Mr. Palm's for approximately 1-1 1/2 hours.

13. Mr. Palm then drove Smith-Flatow to her parked car.

14. Smith-Flatow drove her frozen car at a very low rate of speed because of the extreme temperatures.

15. At approximately 12:30-1:00 p.m., Plaintiff Smith-Flatow was stopped by Defendant Officers at Clark and Huron Streets for failing to stop at a stop sign.

16. Defendant Wise approached Plaintiff Smith-Flatow's car and requested her insurance and registration.

17. Plaintiff Smith-Flatow reached over and opened her glove-compartment, removed her registration and proof of insurance, and gave it to the Defendant Officers.

18. At no time was there a plastic zip-lock baggie containing a white powdery substance in her glove compartment.

3

19. The Defendant officers then asked Smith-Flatow if she had been drinking. Smith-Flatow told the officers that she'd had some wine earlier in the evening.

20. The Officers then ordered Smith-Flatow from her car and subjected her to a series of field sobriety tests.

21. She was then asked to submit to a breathalyzer test which she refused. Upon her refusal, the Defendant officers handcuffed Smith-Flatow and transported her to the 18th Chicago Police District Station at 1160 N. Larabee Avenue, Chicago, where she was placed in a cage.

22. Smith-Flatow's car was impounded by Defendant Officers and subsequently searched pursuant to an inventory search.

23. A bag of flour, which had been in Smith-Flatow's car for several weeks and was a part of her child's science project, was in the back of her car.

24. While Smith-Flatow was at the 18th district station, Defendant Wise entered holding area where Smith-Flatow was locked-up and walked past her and said to at least two other officers, "look what I found in her car," as he held a zip-lock bag containing a white powdery substance above his head.

25. When she saw the zip-lock baggie, she asked to make a phone call to check on her kids.

26. When defendant learned that plaintiff was a mother he called Smith-Flatow "a fucking whore," "a fucking liar" and "a drug addict." He told her she was "a lying fucking whore who does drugs and leaves her children home alone."

27. Officer Wise then displayed her driver's license to other officers and stated that "you can tell she is a lying whore because she dyes her hair."

4

28. The Defendant Wise then told Smith-Flatow that because "she was a liar and a fucking whore, drug-addict who leaves her kids at home," that he had to go get them.

29. The Defendant officers left the 18th District station and were gone for about an hour before returning to the station.

30. The Defendant Wise continued to harass Smith-Flatow by calling her a "fucking whore who does drugs and leaves her kids home alone," for another 3-4 hours.

31. The Officers knocked on the door and rang the bell repeatedly, but per their parent's standing instructions, the children did not answer the door.

32. The Defendant Officers returned to the 18th district, where Officer Wise continued to call Smith-Flatow a "fucking liar, whore, drug-addict who fucking does drugs and leaves her children at home alone."

33. At times during this ongoing harassment, Defendant Wise, in Smith-Flatow's presence, told other Chicago police officers at the 18th district station that Smith-Flatow was "a fucking whore liar who does drugs and leaves her children at home."

34. During this ongoing harassment, Officer Reyes came over to the cage and whispered to Smith-flatow that she "should be quiet and we'll get you through this."

35.  Defendant officers then telephoned Smith-Flatow's sister, Sandra Smith.

36. Smith-Flatow's sister arrived at the 18th district station soon thereafter.

37. Defendant Wise said with-in ear-shot of Smith-Flatow that he could no longer "do anything" to Smith-Flatow because "her fucking blood was here."

38. Defendant Wise questioned Smith-Flatow's sister in such a manner that implied that Smith-Flatow was a prostitute, including asking whether she as a habit, traveled late

5

at night, what was "your sister doing with drugs," and "do you even know what she does."

39. Smith-Flatow remained in custody until at the 18th district until she was transported to the Cook County Jail at 26th & California, at approximately 9-10 a.m.

40. At 26th, she was place in holding area with approximately 12 other people until brought before a Judge in Bond Court at approximately 1:00 p.m.

41. At the Cook County Jail, she went through intake, had blood drawn, was and remained in custody until midnight.

42. The February 8, 2007, laboratory report from the Illinois State Police, Division of Forensic Services found 36.1 grams of powder from two plastic bags to be: "no scheduled substance found."

43. On February, 2007, the felony Possession of Controlled Substance was Nolle Prosique.


### Count I—Section 1983 Equal Protection Claim

44. Plaintiff realleges and reincorporates all previous paragraphs.

45. Under 42 U.S.C. § 1983, a person who, acting under color of state law, deprives another person of his federal constitutional rights is liable to the injured party.

46. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny any person the equal protection of the laws.

47. Defendant Officers' actions as alleged herein were motivated by anti-female animus. The word "whore" is a common derogatory term used frequently to denigrate women.

Defendant Wise repeatedly subjected Plaintiff to anti-women animus. Officer Wise made it clear that he felt he could treat Smith-Flatow different then other people because she is a woman.

48. Defendant Officers were acting "under color of state law."

49. Defendant Officers purposefully singled out Plaintiff for unequal treatment based on her gender.

50. Defendant Officers' actions do not serve any sufficient, legitimate government interest.

51. As a result of Defendant Officers' denial of equal protection, Plaintiff sustained in the form of, *inter alia*, mental and emotional pain and suffering, humiliation, and past and future psychological damage. As a result Defendant Officers' denial of equal protection, Plaintiff also incurred expenses, costs and attorneys' fees.

52. Defendant Officers deprived Plaintiff of the equal protection of the laws in violation of Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution. Defendant Officers are, therefore, liable to Plaintiff under 42 U.S.C. § 1983.

53. Wherefore, Plaintiff requests actual and compensatory damages in an amount deemed at time of trial to be just, and fair, as well as attorneys fees and costs

### COUNT II—Failure to Intervene, 42 USC Section 1983

54. Plaintiff realleges and incorporates all of the allegations in preceding paragraphs.

55. Each of the Defendant Officers had a reasonable opportunity to prevent the other Defendant Officer from denying Smith-Flatow equal protection under the law because of her gender, intentionally inflicting emotional distress, assaulting,

7

unlawfully seizeing, falsely arresting and imprisoning her, but failed to do so.  As a result of the Defendant Officers' failure to intervene, Plaintiff suffered humiliation and emotional distress.

56. This misconduct was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to the rights of Smith-Flatow.

57. This misconduct was undertaken by the Defendant Officers within the scope of their employment and under color of law such that their employer, City of Chicago, is liable for their actions, as more fully described in Count XII.

58. Wherefore, Smith-Flatow demands judgment against Defendant Officers for actual and compensatory damages in an amount deemed at time of trial to be fair and just, as well as reasonable attorneys' fees and legal costs.

## COUNT III—Intentional Infliction of Emotional Distress

59. Plaintiff re-alleges and incorporates by reference all of the allegations in the preceding paragraphs.

60. The acts and conduct of Defendant Officers as set forth above were extreme and outrageous.

61. Particularly, the conduct of Defendant Officers calling Smith-Flatow a "fucking liar, whore, drug-addict who fucking does drugs and leaves her children at home alone," and threatening to take her children, causing him to be arrested and filing false complaints against him, was reasonably calculated to cause immense emotional distress to Smith-Flatow.

62. Defendant Officers intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

8

63. Defendant Officer's conduct was undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff.

64. Said actions and conduct did directly and proximately cause Smith-Flatow extensive anxiety and suffering, and emotional distress.

65. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding damages, including actual, compensatory and punitive, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.

**Count IV—State Law Claim Assault**

66. Plaintiffs reallege and incorporate by reference all of the allegations in the preceding paragraphs.

67. The Defendant Officers intentionally created an apprehension in Smith-Flatow of immediate physical harm by means of various overt behaviors intended to cause fear of harmful touching by the actual beating.

68. These actions were objectively unreasonable and were undertaken intentionally with malice, willfulness and reckless indifference to Smith-Flatow rights.

69. As a result of this conduct, Plaintiff sustained emotional and physical injuries.

70. Wherefore, Smith-Flatow demands judgment against Defendant Officers for actual and compensatory damages, as well as punitive damages, in an amount deemed at time of trial to be fair and just, as well as reasonable attorneys' fees and legal costs.

**Count V-Unlawful Seizure**

71. Plaintiffs reallege and reincorporate by reference all previous paragraphs.

72. As described above, Defendant Officers conspired among themselves and falsely arrested and detained Plaintiff without legal justification thus violating plaintiffs rights under the Fourth Amendment to the United States Constitution, and 42 U.S.C. Section 1983.

73. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

74. Defendants swore out complaints containing false information. Defendants were aware that these complaints were false.

75. Defendants knew these complaints to be false.

76. By this conduct, Defendants caused the unlawful detention of Plaintiff.

77. As a direct and proximate result of the wrongful actions of Defendants Plaintiff suffered mental, emotional and physical damage and traumas, humiliation, loss of liberty, mental distress and anguish, and actual damages in the form of lost wages and medical expenses.

78. WHEREFORE, Plaintiff respectfully request that judgment be entered in his favor, awarding damages, legal costs, including attorney's fees, and other such relief as the Court deems just and appropriate.


## VII-State Claim Respondent Superior

79. Plaintiffs reallege and incorporate all of the allegations in the preceding paragraphs.

80. In committing the acts alleged, Defendant Officers were members and agents of the Chicago Police Department, acting at all relevant times within the scope of their employment.

10

81. Defendant City of Chicago is the employer of the Defendant Officers.

82. In Illinois, public entities are directed to pay for any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities. 735 ILCS 10/9-102.

83. As a proximate cause of Defendant Officer's unlawful acts, which occurred within the scope of their employment activities, Plaintiff suffered physical and emotional injuries.

84. WHEREFORE, Plaintiffs demand judgment against Defendants City of Chicago for substantial compensatory damages, plus costs and attorneys' fees and whatever additional relief this Court finds equitable and just.

## COUNT VI—42 U.S.C. Section 1983 *Monell* Claim

85. Plaintiffs reallege and incorporate all of the allegations in the preceding paragraphs.

86. The actions of the individual Defendant Officers as alleged above were done pursuant to one or more *de facto* policies, practices and/or customs of the City of Chicago, Chicago Police Department, the CPD's Office of Professional Standards, and the CPD's Internal Affairs Division.

87. Among the de facto policies of the municipality and its agents were:

   **a.** The failure to properly investigation allegations of police misconduct.

   **b.** The failure to have a system which monitors patterns of alleged police misconduct.

   **c.** The failure to properly discipline sustained allegations of police misconduct.

    d.   The failure to properly maintain records of police misconduct and

          allegations of police misconduct, including the use of excessive force and

          false arrest.

    e.   The failure to properly hire, train, monitor, and/or supervise officers.

88. A *de facto* policy, practice, and custom of the police code of silence results in police

officers refusing to report instances of police misconduct of which they are aware,

including the maltreatment of persons, despite their obligation under Department

regulations to do so.  This conduct included police officers who remain silent or give

false or misleading information during official investigations in order to protect

themselves or fellow officers from internal discipline or retaliation, civil liability, or

criminal prosecution.

89. The aforementioned policies, practices, and customs, individually and collectively

have been maintained and/or implemented with deliberate indifference by the

Defendant City of Chicago, and have encouraged the individual Defendants to

commit the aforesaid wrongful acts against plaintiffs, and therefore acted as a direct

and proximate cause of the complained of Constitutional and other legal violations,

and Plaintiff's injuries.

90. WHEREFORE, Plaintiff requests that judgment be entered in favor of Plaintiff and

against Defendant City of Chicago, and that the Plaintiff be awarded compensatory

damages, reasonable attorney's fees, costs, expenses and any other relief that this

Honorable Court finds appropriate and just. Plaintiff also seeks injunctive relief in the

form of an order to the City of Chicago to commit resources and training on the issue

of dealing with gender issues.

## **COUNT VII-- Due Process Claim Newsome Claim**

91. Plaintiffs realleges and incorporate by reference the foregoing paragraphs as if set forth in full herein.

92. As described above, Defendant Officers' acts and omissions deprived Plaintiff of rights, privileges and immunities secured to her by the Due Process Clause as contained in the Fourth, Fifth and Fourteenth Amendment to the United States Constitution.

93. Defendant Officers caused Plaintiff to be arrested and charged Driving Under the Influence of Alcohol, 625 ILCS 11/5-1(a)(2) under case number TM-292-762, without probable cause.

94. Defendant officers then swore out false complaints and wrote up false police reports intended to mislead prosecutors. As a result of conduct, Plaintiff was seized, unlawfully searched, incident to his arrest, and subsequently charged with a crime he did not commit, placed in a cell until he was bonded out, had his liberty restricted by being forced to conform to the pre-trial conditions of bond, and was forced to attend court dates..

95. Criminal proceedings were instituted against Plaintiff based upon the conduct of Defendant Officers.

96. Defendant Officers deprived the Plaintiff of her rights by engaging in multiple acts, which include but are not limited to submitting false charges, submitting false police reports, fabricating information on reports and manipulating evidence for the purpose of ensuring that the Plaintiff was charged and with the intention of having Plaintiff wrongfully convicted.

13

97. The DUI was dismissed on June 16, 2008.  Defendant Officer's acts and omissions described in this complaint directed against Plaintiff, were material and intentional, and were in violation of the Plaintiff's due process rights.

98. The aforementioned actions of Defendant Officers caused the Plaintiff to suffer mental and physical anguish, humiliation as a result of the charges brought against her, damage to his reputation, and forced her to incur unnecessary costs associated with defending the false charges brought against him.

99. The individual Defendants' conduct violated plaintiff's right to due process pursuant to the United States Constitution.

100.    WHEREFORE, Plaintiff Caroline Smith-Flatow requests that judgment be entered in her favor and against the individual Defendants and that she be awarded compensatory and punitive damages, reasonable attorney's fees, costs, and expenses and such further relief as this Court deems just.

### COUNT VII—Malicious Prosecution Claim

101.    Plaintiff incorporates and realleges all previous paragraphs.

102.    The Defendant Officers maliciously caused criminal charges to be filed and prosecuted against plaintiff. There was no probable cause for the institution of a criminal charge against plaintiff. The criminal proceedings were commenced and continued maliciously.

103.    The individual defendants facilitated this malicious prosecution by falsifying evidence, creating false police reports, falsifying written criminal charges, and giving false and perjured testimony under oath.

14

104.　　Plaintiff was wrongfully incarcerated as a direct result of the prosecution of this

criminal charge.

105.　　The dui charge was dismissed by the State on June 16, 2008.

106.　　Plaintiff was injured, including emotional and physical damage, lost wages, legal

fees, traumas, humiliation, loss of liberty, mental distress and anguish.

107.　　Defendants' conduct was willful and wanton.

WHEREFORE, Plaintiff respectfully request that judgment be entered in her favor,

awarding damages, including punitive damages, legal costs, including attorney's fees, and

other such relief as the Court deems just and appropriate

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully Submitted,


_____　　　　　　_____

Jon F. Erickson　　　　　　　　　　　Michael D. Oppenheimer


Erickson & Oppenheimer, LLC　　　　　Erickson & Oppenheimer, LLC
4554 N. Broadway, Suite 325　　　　　　4554 N. Broadway, Suite 325
Chicago, IL 60640　　　　　　　　　　Chicago, IL 60640
773-907-0940　　　　　　　　　　　　773-875-4646
ARDC: 6205277　　　　　　　　　　　ARDC: 6292220

15

## CERTIFICATE OF SERVICE

    Jon F. Erickson, a licensed attorney, state that on June 2, 2008 a copy of the foregoing 1st AMENDED COMPLAINT was caused to be delivered, electronically, to the following:

Helen Gibbons
City of Chicago Department of Law
30 N. La Salle St.
Suite 1020
Chicago, IL 60602

Ashley Kosztya
City of Chicago Department of Law
30 N. La Salle St.
Suite 1020
Chicago, IL 60602

/s/ Jon F. Erickson
Jon F. Erickson

**<u>DEFENDANTS' EXHIBIT B</u>**

Westlaw.

--- F.3d ----                                                                                    Page 1
--- F.3d ----, 2008 WL 4095483 (C.A.7 (Ill.))

**H** Carvajal v. Dominguez
C.A.7 (Ill.),2008.
Only the Westlaw citation is currently available.
United States Court of Appeals,Seventh Circuit.
Raul CARVAJAL, Plaintiff-Appellee,
v.
Louis DOMINGUEZ, Jr., in his individual capacity,
Defendant-Appellant.
No. 07-2598.

Argued April 8, 2008.
Decided Sept. 5, 2008.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division. No. 05
C 2958-James F. Holderman, Chief Judge.

Robert R. Cohen, Frankel & Cohen, James D.
Tunick, Chicago, IL, for Plaintiff-Appellee.
Richard Montague, Department of Justice,
Washington, D.C., for Defendant-Appellant.

Before KANNE, WILLIAMS, and TINDER, Circuit
Judges.

TINDER, Circuit Judge.
**\*1** The plaintiff/appellee, Raul Carvajal, was
prosecuted in the Southern District of Florida for
money laundering and was acquitted at the
conclusion of a jury trial. He then brought this civil
suit in the Northern District of Illinois against
defendant/appellant Drug Enforcement
Administration ("DEA") Task Force Officer Louis
Dominguez, Jr. for damages, alleging violations of
his constitutional rights in connection with the
criminal prosecution. The Illinois district court
granted Dominguez's motion for summary judgment
in part by dismissing several counts of Carvajal's
amended complaint, but the court denied the motion
with respect to a count which asserted a *Bivens* cause
of action alleging a *Brady* violation. That decision
also included a denial of qualified immunity for
Dominguez. This appeal followed.

**I. Background**

The relevant facts revolve around Officer
Dominguez's identification of Carvajal in two
undercover money pickups in Chicago. Chicago DEA
Task Force Officer Wayne Hunter was assisting in an
investigation (called "Operation Double Trouble") of
a Miami-based money laundering operation in early
April 2001. DEA Miami asked for assistance in
arranging two undercover money pickups in Chicago.
DEA Miami provided Hunter with a cell phone
number and a code to be used to arrange the pickups.
The first pickup was to occur on April 16, 2001.
Hunter asked agent Dominguez to do the job.
Dominguez used the cell number to arrange to meet
two individuals; he later identified them as German
Matos Ruiz and Raul Carvajal. Dominguez met with
the men for about five minutes in the midafternoon
inside a Coconuts music store, and he saw them in
the parking lot where he spoke with the man
identified as Ruiz for a few minutes and observed the
man identified as Carvajal sitting in a vehicle. A
second transaction took place on April 21, 2001.
Dominguez again identified the men as Ruiz and
Carvajal; a woman was also with them. This meeting
took place in a Baker's Square restaurant. The
meeting lasted about 15 minutes. During the meeting
Dominguez initially sat next to the man identified as
Carvajal with the man identified as Ruiz across the
table; later the men switched, putting the supposed
Carvajal across the table from Dominguez. This
meeting also occurred in the midafternoon.

It is unclear just when Hunter learned of Carvajal's
name in connection with the money laundering
investigation-he testified in a deposition in this civil
action that he may have gotten the name from DEA
Miami or from a Chicago field office intelligence
analyst who traced the cell number to Carvajal's ex-
wife. Either way, on April 9, 2001, an intelligence
analyst in Chicago requested a photo of Carvajal
from the Illinois Secretary of State. Hunter did not
remember when he got the photo or whether he had it
before April 16, the date of the first undercover
pickup. Hunter said he knew Carvajal's name by
April 15th and may have had the picture by the 16th.

**\*2** Dominguez said that he did not see Carvajal's
photo or have his name prior to the April 16th
meeting. Dominguez claims that he first saw

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 4095483 (C.A.7 (Ill.))

Carvajal's photo sometime between the first meeting on April 16 and May 14, 2001, the date of his written reports. He cannot recall whether he saw another photo at the same time he saw Carvajal's or not. He never saw a formal lineup. Hunter testified that he "possibly gave Carvajal's name and photographic image to Dominguez prior to the April 16, 2001, operation to make sure that Dominguez had all the information about the case and that Dominguez was not meeting with someone he already knew."It is agreed that Hunter would have provided whatever information he had to Dominguez, including the photo-doing so would have been his "normal practice."

A federal grand jury in Miami indicted Carvajal and 33 others in connection with a money laundering scheme; in a superceding indictment he was charged only with acting as a courier. Carvajal filed a motion to suppress Dominguez's identification of him as unduly suggestive in light of the "one-photo procedure used." The judge denied the motion after an evidentiary hearing at which Dominguez and another law enforcement officer (not Hunter) testified. The judge began his ruling with the assumption that the photo identification procedure used by Dominguez was unduly suggestive, but he found that "regardless of whether the procedure used was impermissibly suggestive, there was not a substantial likelihood of misidentification."He noted that Dominguez had an "excellent opportunity to view Carvajal at the time of the two money pick ups" and that there was no evidence that he was "pressured to select Carvajal's photograph." That judge also made a finding that during a separate undercover money pickup (in which Dominguez was not involved), a vehicle was seen that was registered to Carvajal's ex-wife. Later, in a trial with one co-defendant, who was found guilty, a jury acquitted Carvajal.

This brings us to the instant case in which Carvajal brought this civil suit in the Northern District of Illinois for damages against Dominguez. The district court granted Dominguez's motion for summary judgment on Count One, a claim for false arrest and unlawful search and seizure, and Count Two, a claim alleging a "deprivation of liberty." The court also granted the motion with respect to Count Four-a claim for perjury-noting police witnesses are entitled to absolute immunity from perjury claims for trials

and pretrial proceedings and found no evidence supporting an application of the "complaining witness" exception to this rule. Count Three claimed that Dominguez withheld favorable evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). The amended complaint alleged that he "knowingly and falsely identified Carvajal as the perpetrator in a money laundering conspiracy and wrote false police reports about him."The district court denied Dominguez's motion for summary judgment with respect to this claim. In its decision, the court rejected the notion that an acquitted defendant, such as Carvajal, cannot have a *Brady* claim but noted that the question is an open one in this circuit and that the district court is split on the question. The court concluded that an acquittal "alone does not show that the police officers complied with *Brady* or that the defendant's trial was fair" and applied the *Brady* analysis "on a prospective basis." [FN1]Analyzing under *Brady,* the judge explained: "Carvajal identified as exculpatory Dominguez's alleged failure to tell the prosecutor that he was given Carvajal's name and photographic image before the first transaction on April 16, 2001.""This evidence would have impeached Dominguez's testimony at trial that he did not know Carvajal's name or see his photograph until after the April 16, 2001 transaction and undermined the credibility of Dominguez's post-April 16, 2001 identification of Carvajal."According to the district court, this was "material" because it "would have changed the outcome of the suppression hearing, and the withholding of evidence denied him a fair trial."The court also concluded that Dominguez was not entitled to qualified immunity explaining that "the boundaries of *Brady* as applied to this case have long been established."

> FN1. The following, from *Carroccia v. Anderson,* another case from the Northern District of Illinois, explains the rationale behind this "prospective test":
>
>> *Brady* and its progeny impose a duty on prosecutors and police officers to produce evidence favorable to the accused where the evidence is material either to guilt or punishment. To discharge this duty, law enforcement officials must make prospective judgments regarding the materiality of exculpatory evidence that comes to their attention. They must decide

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in advance of trial, and without knowing how the trial will come out, whether evidence favorable to the accused has a "reasonable probability" of affecting the outcome of the case. If courts prohibit a criminal defendant from making a civil claim for concealment of material exculpatory evidence simply because his trial resulted in an acquittal, we tolerate law enforcement misconduct simply because the defendant was able to overcome it by other means.

_Carroccia v. Anderson,_ 249 F.Supp.2d 1016, 1023 (N.D.Ill.2003) (internal citations omitted).

*3 Dominguez now appeals.

## II. Discussion & Analysis

This case comes to us from a _denial_ of summary judgment-typically a case in such a posture is not immediately appealable to our court. We have jurisdiction, however, under 28 U.S.C. § 1291 and the "collateral order" doctrine. An appeal of an order denying qualified immunity is a well-established application of this doctrine: "A district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law is an appealable final decision within the meaning of 18 U.S.C. § 1291, notwithstanding the absence of a final judgment."_Mitchell v. Forsyth,_ 472 U.S. 511, 530 (1985).

The Supreme Court recently clarified that the scope of this doctrine includes jurisdiction over whether "to devise a new _Bivens_ damages action" and explained:

We recognized just last Term that the definition of an element of the asserted cause of action was "directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal."_Hartman v. Moore,_ 547 U.S. 250, 257 n. 5 (2006). Because the same reasoning applies to the recognition of the entire cause of action, the Court of Appeals had jurisdiction of this issue, as do we.

_Wilkie v. Robbins,_ 127 S.Ct. 2588, 2597 & n. 4 (2007). Thus, we have jurisdiction over the questions presented by this appeal. Our review is de novo. _See Wernsing v. Thompson,_ 423 F.3d 732, 741 (7th Cir.2005); _Wade v. Hopper,_ 993 F.2d 1246, 1251 (7th Cir .1993).

Determining whether a defendant law enforcement officer is entitled to qualified immunity involves a two-step analysis. The first step is whether the facts alleged, taken in the light most favorable to the plaintiff, amount to a constitutional violation. If not, the inquiry ends, and the officer has qualified immunity. If yes, then the second step is whether the violated right was clearly established. This is determined by looking at whether it would be clear to a reasonable official that his or her conduct was unlawful in the situation. _E.g., Michael C. v. Gresbach,_ 526 F.3d 1008, 1012 (7th Cir.2008). We begin with the first prong and address whether the facts alleged show a constitutional violation.

The constitutional violation alleged in this case was a violation of due process for failure to turn over exculpatory/impeaching evidence to the defendant as constitutionally required-a so-called _Brady_ violation._Brady v. Maryland,_ 373 U.S. 83 (1963). While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation. _See Youngblood v. West Virginia,_ 547 U.S. 867, 870 (2006) ("[A] _Brady_ suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor ....' " (citing _Kyles v. Whitley,_ 514 U.S. 419, 438 (1995))); _Strickler v. Green,_ 527 U.S. 263, 280-81 (1999); _Steidl v. Fermon,_ 494 F.3d 623, 628, 630-32 (7th Cir.2007). A _Brady_ violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued-in other words, "materiality." _See Youngblood,_ 547 U.S. at 869-70;_United States v. Bland,_ 517 F.3d 930, 934 (7th Cir.2008); _Ienco v. Angarone,_ 429 F.3d 680, 683 (7th Cir.2005). Evidence is "suppressed" when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 4095483 (C.A.7 (Ill.))

through the exercise of reasonable diligence. *Ienco, 429 F.3d at 683.* Evidence is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler, 527 U.S. at 280* (internal quotations omitted); *see also Bland, 517 F.3d at 934.*

**\*4** Specifically, Carvajal alleges that Dominguez failed to disclose that he had Carvajal's name and saw his photograph prior to the first undercover drug pickup on April 16th. Dominguez's version of the events is that he did not see Carvajal's photograph until sometime after the first undercover pickup. Hunter's deposition testimony, on the other hand, suggests that perhaps Dominguez had the photo earlier, prior to the first pickup. This can be inferred from the April 9th request to the Illinois Secretary of State for a photograph of Carvajal and Hunter's deposition testimony in the civil case that he was "sure" he would have a picture back from the Illinois Secretary of State within a week. Hunter and Dominguez also explained that, per the usual practice, if Hunter indeed had the photograph of Carvajal before the April 16th undercover pickup he would have shown it to Dominguez. Carvajal claims that this fact would have been used to impeach Dominguez and would have changed the outcome of the suppression hearing and that perhaps Carvajal would not even have been subjected to a trial. We simply cannot agree, however, that this amounts to a *Brady* violation.

At the most (as we must assume from the conflicting recollections of when the photo may have been viewed), the facts could support an inference that Dominguez did see the photo before the first pickup and that he lied about when he saw the photograph. But a lying witness is certainly not a *Brady* violation. It is already established law that *Brady* does not extend so far as to provide relief in a situation where "a police officer makes a false statement to a prosecutor." *Harris v. Kuba, 486 F.3d 1010, 1017 (7th Cir.2007)* ("Harris essentially seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement. This court has already foreclosed this extension."); *see also Sornberger v. City of Knoxville, 434 F.3d 1006, 1029 (7th Cir.2006)* ("The Constitution does not require that police testify

truthfully; rather the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies."(citations omitted)).

Moreover, both Hunter and Dominguez were accessible to the defense for the hearing on the motion to suppress the identification in the criminal case. It is Carvajal's responsibility to probe the witnesses and investigate their versions of the relevant events. There was nothing preventing Carvajal from discovering and drawing out this discrepancy between the officers' stories during the suppression hearing. Suppression does not occur when the defendant could have discovered it himself through "reasonable diligence." *Ienco, 429 F.3d at 683;cf. United States v. Tadros, 310 F.3d 999, 1005 (7th Cir.2002).Brady* does not require disclosure by one officer that he and another officer, both called as witnesses, have slightly different versions with respect to precisely which date they saw Carvajal's photograph or learned his name.

**\*5** There is also a logical flaw in Carvajal's argument. His "claim is based on the fact that Dominguez failed to disclose to the prosecutors that he was given Carvajal's name and shown his photograph prior to the first transaction ... while insisting the opposite in his ... police reports and during his testimony...." Appellee's Br. at 10. However, the fact that Dominguez saw the photograph or had the name prior to the first meeting itself is not impeaching. Under *Brady,* the evidence suppressed must be exculpatory or impeaching, not the fact that it was suppressed. Now, perhaps, one could, at least logically, argue that the *prosecutor's* failure to disclose that Dominguez lied violated *Brady* (thus the suppressed impeaching evidence was the fact that Dominguez lied and not the fact that he saw a photo). Carvajal did not advance such an argument, however, and regardless, it could not logically support a cause of action against *Dominguez himself,* rather than the prosecutor.

And by itself the fact that he saw the photograph before the first pickup is not exculpatory either-too many inferences have to be made to reach that conclusion. *See Harris, 486 F.3d at 1016* ("None of the pieces of evidence [the plaintiff] points to, when considered at face value, is exculpatory.... [T]he evidence is arguably favorable only after several

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----
--- F.3d ----, 2008 WL 4095483 (C.A.7 (Ill.))

inferences are made.... This stretches the meaning of 'favorable' beyond that of *Brady.*"). Simply because a trained officer viewed a photograph of someone he might potentially encounter in an undercover investigation-to make sure it was not someone he already knew, or someone who might know him-does not amount to exculpatory evidence. This is regular police practice-in fact, a sign of good police work. It only makes sense that an officer going undercover would gather information about the individuals he may meet, if for no other reason, to preserve his undercover status and ensure his (and others') safety. As Hunter and Dominguez testified, obtaining and looking at such information was part of their regular practice. Frankly, it is quite difficult to see at all how the regular police practice of checking a photograph before meeting someone undercover amounts to exculpatory evidence.

Similarly, there is also no "reasonable probability" that if Dominguez had disclosed that he had Carvajal's name and/or had seen the photograph prior to the April 16th pickup that his identification of Carvajal would have been suppressed or the charges dropped. *See Strickler,* 527 U.S. at 290 ("[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the [outcome].' " (quoting *Kyles,* 514 U.S. at 435)). The judge at the suppression hearing (in response to Carvajal's challenge to the one-photo procedure used) assumed that a suggestive identification procedure had been utilized, but nevertheless concluded that there was "not a substantial likelihood of misidentification." Dominguez had an "excellent opportunity to view [Carvajal] at the time of the two money pick ups." There was also other evidence supporting the conclusion that Carvajal was involved besides Dominguez's identification-the cell phone number and car links to his ex-wife, for instance. So, even if there were something troubling about when Dominguez saw the photo, Carvajal has not shown that it would have made any difference in the outcome. If we focus on the possible impeachment aspect, the best Carvajal could have achieved is casting some doubt on Dominguez's credibility-however, he has presented no persuasive explanation that Dominguez was motivated by some malice or even that he purposefully lied. Thus any impeachment value from the inconsistent testimony between Hunter and Dominguez seems insignificant. We cannot reasonably see how the discrepancy about

when a photo was seen would have caused the prosecution's entire case to unravel or the suppression judge to alter his ruling. Moreover, everyone agrees that the photograph was seen at *some* point before the end of the investigation. And the suppression hearing judge explicitly determined that the one-photo method did not undermine the reliability of the identification. *See also United States v. Brown,* 471 F.3d 802, 804-05 (explaining that a trained officer viewing photographs is not the same as a witness "trying to separate a culprit from a crowd"); *id.* at 805 ("The officers approached the photo not as victims open to persuasion by officialdom, but as skeptics trying to check up on their new source."). Carvajal has not established a "reasonable probability" that the suppression result or the decision to go to trial would have been altered by the desired disclosure.

**\*6** To conclude on this point-inconsistent police testimony does not a *Brady* violation make. Carvajal comes up short on all three elements of a *Brady* claim. Inference upon inference is needed to explain how the evidence is favorable to Carvajal. Most obviously, it is also not rightly considered "suppressed" evidence because Carvajal could have discovered Dominguez's and Hunter's inconsistent testimony himself: the hearing allowed on the identification challenge was his vehicle for doing so. And lastly, Carvajal has not established the third requirement-materiality or prejudice-because there is no reasonable probability that the failure to disclose would have altered the outcome of the suppression or caused the prosecutor to forego the trial.

Since there was no *Brady* violation, we conclude, under the first step in the qualified immunity analysis, that the facts, taken in the light most favorable to Carvajal, do not establish a constitutional violation on the part of defendant Dominguez. Therefore, the district court erred in failing to find that Dominguez was entitled to qualified immunity. As such, his motion for summary judgment should have been granted.

Three other matters deserve brief comments.

The district court reached the second step of qualified immunity analysis in concluding that the obligation to disclose impeaching or exculpatory information would have been clear to a reasonable law

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

--- F.3d ----                                                                    Page 6
--- F.3d ----, 2008 WL 4095483 (C.A.7 (Ill.))

enforcement officer. Given our conclusion that no *Brady* violation occurred here, we do not need to evaluate that aspect of the ruling. Nonetheless, a more careful examination of this question should have produced a different result. The question at this step, if reached, would not be whether a law enforcement officer would clearly know that he had to disclose impeaching or exculpatory information. That assumed the result. Rather, the question should have been whether it was clear that a law enforcement officer would have been expected to disclose whether he had seen a photo of a suspect before he went to a potentially dangerous undercover meeting with that individual. As noted, good police practices and common sense would suggest that an officer ought to prepare in that way. We are aware of no case which clearly indicates, or even hints, for that matter, that a law enforcement officer would be expected to disclose that he had undertaken such preparation. It is about the equivalent of strapping on a concealed weapon or reviewing a suspect's prior criminal history before attending such an undercover encounter. Unless clear guidance is given that such a practice must be disclosed as potentially impeaching or exculpatory, the broad protection of qualified immunity should protect a law enforcement officer from liability for failure to mention viewing a suspect's photo before meeting with him.

We also pause briefly to consider, and express our doubts, about some other aspects of Carvajal's claim. First we are doubtful, in addition to the specific reasons explained *supra,* that an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation. The district court's "prospective" test does not seem to accurately capture what *Brady* protects and misunderstands the "materiality" requirement in a true *Brady* violation. We find the following from the Supreme Court to be instructive on this point:

**\*7** [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence-that is, to any suppression of so-called "*Brady* material"-although strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Strickler,* 527 U.S. at 290. "[T]he question is whether

the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."*Id.* at 289.Therefore, while a prosecutor has to make decisions about what is Brady material prospectively, so to speak, a true constitutional violation is measured with the outcome in mind.[FN2]

> FN2. The plaintiff, as well as Illinois district judges in similar cases, pointed to *Carey v. Piphus,* 435 U.S. 247 (1978), in support. We find this reliance misplaced. In addressing a high school student's suspension without a hearing, the Court concluded that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury."*Id.* at 266.In doing so, the Court was focusing on fair process and was not holding that there was any actual damage or harm resulting from the insufficient process. Therefore, there is not a parallel from *Carey's* holding to the materiality/prejudice requirement of *Brady,* which requires more in order to establish the constitutional violation at issue. Additionally, unlike the instant case, *Carey* was a § 1983 action.

We are equally doubtful, given the considerations in deciding whether to recognize a *Bivens* cause of action,[FN3] that such an action exists for a *Brady* violation. Most specifically it seems that there is an "alternative, existing process for protecting the interest": namely, the disclosure obligation put on the prosecution under *Brady* itself protects the defendant's interest in a fair trial, and, the fact that if a criminal defendant does establish a *Brady* violation he already has a remedy in getting his conviction overturned (of course, an acquittal from the outset, as the defendant received here, is even better). However, we need not labor over these points any longer because it was abundantly clear, as we explained *supra,* that the allegedly suppressed evidence on these facts simply does not rise to the level of a *Brady* violation, and Dominguez is entitled to qualified immunity on that claim.

> FN3. The Supreme Court outlined, in *Wilkie,* 127 S.Ct. at 2598, the two step analysis for whether there is a *Bivens* cause of action: (1) "whether any alternative,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages"; and (2) "even in the absence of an alternative, a *Bivens* remedy is a subject of judgment: 'the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, playing particular heed, however, to any special factors counseling hesitation before authorizing a new kind of fed eral litigation.' "

## III. Conclusion

For the foregoing reasons, we REVERSE the denial of summary judgment on Count Three of Carvajal's Amended Complaint.

C.A.7 (Ill.),2008.
Carvajal v. Dominguez
--- F.3d ----, 2008 WL 4095483 (C.A.7 (Ill.))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.